IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| JIMMIE LEE AKER, | Cause No. CV 17-86-H-JTJ |
| Petitioner, | |
| vs. | ORDER |
| MICHAEL FLETCHER; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

This case comes before the Court on Petitioner Jimmie Lee Aker's application for writ of habeas corpus under 28 U.S.C. § 2254. A jury convicted Aker of sexually assaulting a 12-year-old girl by inserting his fingers in her vagina. He is serving a mandatory sentence of 100 years in prison. Fifty of those years were suspended. Aker must serve 25 years before he is eligible for parole. *See* State Crim. Judgment (Doc. 9-8) at 4, *State v. Aker*, No. DC-10-32 (Mont. Third Jud. Dist. Court Oct. 17, 2011).

Respondents ("the State") and Aker each move for summary judgment. Based on their written consent, this matter is assigned to me for all proceedings, including entry of judgment. *See* Clerk's Notice (Doc. 28); Consents (Doc. 28-1 at 1–2).

1

# I.  Procedural Background

## A.  State Court

On June 10, 2010, Aker was charged in Montana's Third Judicial District Court, Powell County, with one count of sexual intercourse without consent, a violation of Mont. Code Ann. § 45-5-503(1) (2009).[1] In mid-February 2011, new counsel appeared for Aker and represented him through trial and sentencing.

Trial commenced on May 16, 2011. The victim—C., a 12-year-old girl who was 13 years old at the time of trial—testified as the first witness. Several prosecution witnesses testified to what C. told them about the incident. Aker presented witnesses and testified himself. On May 19, 2011, the jury found Aker guilty.

Aker appealed. He asked the Montana Supreme Court to review the prosecutors' closing arguments for plain error. He also asserted that trial counsel were ineffective because they failed to object to the State's introduction of hearsay testimony. The Montana Supreme Court declined to exercise plain-error review concerning the State's closing argument. As to the hearsay claim, the court found the record was not sufficiently developed to show why trial counsel did not object. It dismissed the ineffective assistance claim without prejudice so that Aker could

---

[1]  The State also charged two misdemeanor counts of violating a protection order but apparently dismissed them before trial.  *See* 1 Trial Tr. (Doc. 9-3) at 11:15–16.

pursue it in postconviction proceedings. *See State v. Aker* ("*Aker I*"), 2013 MT 253 ¶¶ 31, 37.[2]

Justice McKinnon, joined by Justice Cotter, dissented on both issues. She contended that the prosecutor plainly erred in his closing argument and caused sufficient prejudice to Aker to warrant a new trial. *See Aker I* ¶¶ 39–45. She also asserted that trial counsel could not have had a strategic reason not to object to inadmissible hearsay testimony from five witnesses. *See id*. ¶¶ 46–65.

On October 8, 2013, Aker, acting *pro se*, initiated collateral review in the trial court. He filed a petition for postconviction relief and a motion for the appointment of new counsel to represent him. The State filed a response and an affidavit from trial counsel. On April 8, 2015, the trial court denied the petition.

Again, Aker appealed. The Montana Supreme Court affirmed the trial court's denial of postconviction relief, stating that "Aker's petition . . . lacks the required elements of [Mont. Code Ann.] § 46-21-104(1)(c)." *Aker v. State* ("*Aker II*"), 2016 MT 236N ¶ 12. Subsection 104(1)(c) requires postconviction petitioners to "identify all facts supporting the grounds for relief set forth in the petition and have attached affidavits, records, or other evidence establishing the existence of

---

[2] This Order uses the Montana Supreme Court's public-domain citation format for cases decided in and after 1998. Its format pinpoints paragraphs, as opposed to pages, making references easier to locate. A number followed by "N," as in *Aker II*, 2016 MT 236N, indicates an unpublished decision.

those facts." Mont. Code Ann. § 46-21-104(1)(c) (1997).

Again, Justice McKinnon dissented as to both issues, arguing that Aker should be allowed to proceed on his claims. *See Aker II* ¶ 14.

### B. Federal Court

Aker timely filed his federal petition on August 4, 2017. *See* 28 U.S.C. § 2244(d)(1)(A), (2); *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). After this Court appointed counsel to represent him, *see* Order (Doc. 13), Aker filed an amended petition raising five claims. In a previous order, the Court found all claims defaulted but excused the defaults under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). *See* Order (Doc. 33) at 5–14 (default), 14–24 (excuse).

Aker does not oppose the State's motion for summary judgment on Claims 3 and 4. Three claims remain at issue:

Claim 1    Trial counsel violated Aker's Sixth Amendment right to effective assistance by failing to object to the prosecutor's improper and inflammatory remarks during closing argument.

Claim 2    Trial counsel violated Aker's Sixth Amendment right to effective assistance by failing to object to hearsay statements elicited through five witnesses.

Claim 5    The cumulative effect of trial counsel's deficiencies prejudiced Aker's defense.

*See* Am. Pet. (Doc. 18) at 18–33, 39–40.

Because the Montana Supreme Court did not issue a decision on the merits of Aker's ineffective assistance claims, they are reviewed *de novo*. *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Rogers v. Dzurenda*, 25 F.4th 1171, 1181 (9th Cir. 2022); *Runningeagle v. Ryan*, 825 F.3d 970, 978 (9th Cir. 2016).

## II.  Analysis

Aker claims counsel violated his Sixth Amendment right to effective assistance by failing to object to the State's use of hearsay prior consistent statements and to the State's closing arguments.

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Aker must prove (1) that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. When a petitioner asserts ineffective assistance of trial counsel, "the proceeding" is the trial, not a subsequent appeal. *See Dickinson v. Shinn*, 2 F.4th 851, 860 (9th Cir. 2021) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993); *Walker v. Martel*, 709 F.3d 925, 941 (9th Cir. 2013)).

As the State points out, counsel's performance is presumed reasonable. Aker must prove it unreasonable. Especially after a long time has passed and

counsel have represented other clients at other trials, counsels' inability to remember why they did or did not do something is not evidence of unreasonable performance. "[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Burt v. Titlow*, 571 U.S. 12, 23 (2013) (quoting *Strickland*, 466 U.S. at 689) (internal quotation marks and brackets omitted). On the other hand, when the Court cannot perceive counsel's conduct as reasonable, relief is justified if counsel's performance caused the defendant adequate prejudice. *See, e.g.*, *Staten v. Davis*, 962 F.3d 487, 495–96, 497–99 (9th Cir. 2020); *Vega v. Ryan*, 757 F.3d 960, 967–68 (9th Cir. 2014) (per curiam).

Aker's claims are addressed in the order they arose at trial.

## A.  Claim 2: Failure to Object to Hearsay

The State presented compelling evidence that C. was sexually assaulted in late November or early December, 2009. Her persistence in relaying her account to others over time was one reason the State urged the jury to believe her testimony. *See, e.g.*, 2 Trial Tr. (Doc. 9-4) at 255:18–256:7 (opening statement); *id*. at 304:8–21, 305:14–306:13, 309:6–17 (direct examination of C.); 4 Trial Tr. (Doc. 9-6) at 831:13–832:3, 844:7–24, 884:3–16 (closing argument). C. testified as the first witness at trial. In direct examination of five subsequent witnesses, the State introduced prior consistent statements by her.

6

Aker's counsel have not explained a strategic reason not to object to the State's use of C.'s prior consistent statements. In view of Montana case law, however, the Court finds that counsel could reasonably believe that objection would be fruitless.

### 1. The Legal Background to Aker's Trial

### (a) Montana Rule of Evidence 801(d)(1)(B)

Montana Rule of Evidence 801 defines hearsay as a statement made by a witness outside of a trial or hearing and offered "to prove the truth of the matter asserted." Mont. R. Evid. 801(c). Hearsay is generally inadmissible. *See* Mont. R. Evid. 802. But a statement "is not hearsay" if:

> The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
>
> (A)   inconsistent with the declarant's testimony, or
>
> (B)   consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of subsequent fabrication, improper influence or motive[.][3] . . .

Mont. R. Evid. 801(d)(1).

"[A] witness could not be supported by evidence of prior consistent statements because no amount of repetition makes the story more probable." 1977 Commission Comments, Mont. R. Evid. 801, subsection (d), para. six (internal

---

[3] Subsection (C) adds that the statement is "one of identification of a person made after perceiving the person." The parties do not indicate that this provision is relevant.

citation omitted). A person who says the same thing at trial and before trial might be repeating the truth. But he might also be doggedly lying or simply mistaken. "[M]ere repetition does not imply veracity." *State v. Scheffelman*, 820 P.2d 1293, 1297 (Mont. 1991) (quoting Weinstein & Berger, *Weinstein's Evidence*, 801–105 to –151 (1988)).

The Montana Supreme Court uniformly holds that trial courts err by admitting a testifying declarant's prior consistent statement if it does not meet the limiting criteria of Rule 801(d)(1)(B).[4] Nonetheless, with near-uniformity, the court finds inadmissible prior consistent statements harmless.

---

[4] *See, e.g.*, *State v. Oliver*, 2022 MT 104 ¶ 27; *State v. Smith*, 2021 MT 148 ¶¶ 32–33; *State v. Tyer*, 2020 MT 273N ¶ 9; *State v. Mitchell*, 2019 MT 186N ¶¶ 12–13; *State v. Killsontop*, 2016 MT 235N ¶¶ 5–6; *State v. McOmber*, 2007 MT 340 ¶¶ 12–18; *State v. Mensing*, 1999 MT 303 ¶¶ 7–17; *State v. Maier*, 1999 MT 51 ¶¶ 36–39; *State v. Veis*, 1998 MT 162 ¶¶ 20–24; *State v. Lunstad*, 857 P.2d 723, 724–26 (Mont. 1993) (all finding trial court erred in admitting prior consistent statements that did not meet limiting criteria of Rule 801(d)(1)(B)). *See also State v. Champagne*, 2013 MT 190 ¶¶ 37–45; *State v. Teters*, 2004 MT 137 ¶ 27; *State v. Medina*, 798 P.2d 1032, 1036–37 (Mont. 1990), *overruled on other grounds by State v. Olson*, 951 P.2d 571, 577 (Mont. 1997); *Scheffelman*, 820 P.2d at 1296–97; *State v. Newman*, 790 P.2d 971, 975 (Mont. 1990); *State v. Hibbs*, 780 P.2d 182, 185 (Mont. 1989); *State v. Mackie*, 622 P.2d 673, 675–76 (Mont. 1981) (all holding statements admissible because they met limiting criteria of Rule 801(d)(1)(B)). *See also State v. Fina*, 902 P.2d 30, 37 (Mont. 1995) (affirming trial court's refusal to allow defendant to call police witnesses to testify to prior consistent statements by trial witnesses because limiting criteria of Rule 801(d)(1)(B) were not met). *But see State v. Anderson*, 686 P.2d 193, 202 (Mont. 1984) (stating that Rule 801(d)(1) "essentially removes from the concept of hearsay prior consistent or inconsistent statements").

The Montana Supreme Court has long held that pointing out inconsistencies or questioning the accuracy of a declarant's memory or perception does not meet the Rule's criteria. The opposing party must question whether the declarant "had [a] reason to testify *falsely*." *Mensing*, 1999 MT 303 ¶ 16 (emphasis added) (following, *see* ¶ 14, *State v. Casaus*, 913 P.2d 669, 673 (N.M. Ct. App. 1996)); *see also Teters*, 2004 MT 137 ¶ 27 (offering party must point to "a specific motive to fabricate").

### (b) Montana Law's Two Harmless Error Tests

The Montana Supreme Court uses one of two different tests to determine whether inadmissible hearsay is harmless. One is a generally applicable test for harmless error. *See State v. Van Kirk*, 2001 MT 184. The other has a longer lineage, including its use in *State v. Veis*, 1998 MT 162. It applies specifically to inadmissible hearsay. *Compare, e.g.*, *Smith*, 2021 MT 148 ¶ 34 (applying *Van Kirk* to determine whether erroneously admitted prior consistent statement was harmless), *with State v. Mitchell*, 2019 MT 186N ¶ 14 (applying *State v. Mensing*, 1999 MT 303, and *Veis*, 1998 MT 162 ¶ 26, for the same purpose).

The *Van Kirk* test holds that, when the State introduces inadmissible evidence to support an element of the charge, it must first demonstrate that "other admissible (cumulative) evidence" supported the same element and, second, that "qualitatively, no reasonable possibility exists that the tainted evidence might have contributed to the defendant's conviction." *Van Kirk*, 2001 MT 184 ¶ 48. The *Veis* test asks only whether the declarant testified. "[W]hen a defendant has the opportunity to cross-examine a declarant because . . . she is present at trial and testifies, the dangers that the hearsay rule seeks to avoid are not present," so "hearsay . . . admitted during another witness's testimony is harmless." *Veis*, 1998 MT 162 ¶ 26.

Neither the *Veis* test nor the *Van Kirk* test takes account of the language of Rule 801(d)(1), the purpose of the limiting criteria for prior consistent statements, or the reason a party introduced the inadmissible prior statement. Presumably, parties introduce prior consistent statements to suggest that repetition implies veracity. Because it doesn't, Rule 801(d)(1)(B) limits admissible prior consistent statements to those "offered to rebut an express or implied charge" that the declarant testified falsely. *See Mensing*, 1999 MT 303 ¶ 16.

Rule 801(d)(1) applies only when the declarant testifies. *See, e.g.*, *State v. Brandon*, 870 P.2d 734, 743 (Mont. 1994). But under the *Veis* test, a violation of Rule 801(d)(1)(B) is harmless if the declarant testifies. *Every* violation of Rule 801(d)(1)(B) is harmless by definition.[5]

Similarly, because a prior consistent statement is "consistent with the declarant's testimony," Mont. R. Evid. 801(d)(1)(B), that testimony will support the same facts as the inadmissible prior consistent statement. Under *Van Kirk*, *every* Rule 801(d)(1)(B) violation satisfies the first component of harmless error.

The second question under the *Van Kirk* test asks whether "qualitatively, by

---

[5] *Mensing*, 1999 MT 303, is similar to Aker's case. Two police officers, the victim's boyfriend, a physician, and another witness all testified that the victim told them Mensing had raped her. They all relayed the details she had provided to them. *See id.* ¶ 20. The Montana Supreme Court held the trial court erred by admitting the statements but followed the *Veis* rule and held the error harmless because the victim testified. *Id.* ¶ 18. *See also Mitchell*, 2019 MT 186N ¶ 14; *Notti v. State*, 2008 MT 20 ¶¶ 35, 38, *overruled on other grounds by Whitlow v. State*, 2008 MT 140 ¶ 18 n.4.

comparison, [the] inadmissible prior consistent statements were such that there was no reasonable possibility they might have contributed to [the defendant's] conviction." *State v. McOmber*, 2007 MT 340 ¶ 35.

At the time of Aker's trial, *McOmber* was the Montana Supreme Court's most recent decision on prior consistent statements. The court found the trial court erred in admitting the statements because they did not meet the limiting criteria of Rule 801(d)(1)(B). It also found, inevitably, that the State passed the first prong of the *Van Kirk* test, because the declarant's testimony supported the same facts or elements as his own prior consistent statements. *See McOmber* ¶¶ 18, 34.

On the second prong of the test, the State argued that "the admission of the prior consistent statements had a minimal effect on the trial because the statements did no more than repeat admissible in-court testimony." *Id*. ¶ 35. The Montana Supreme Court agreed:

> Peltier's testimony and his earlier statements were consistent and tended to prove the same facts. Furthermore, as compared to Peltier's trial testimony, there is nothing about the content of his inadmissible prior consistent statements that was more compelling or deserving of greater evidentiary weight. His earlier statements also were not inflammatory in any way that would improperly prejudice McOmber in the eyes of the jury.

*McOmber*, 2007 MT 340 ¶ 35.

The statements under review in *McOmber* consisted of a transcript of Peltier's interview with a police officer and a written summary of the same

11

interview, reviewed and signed by Peltier. The interview took place when Peltier was jailed for writing an insufficient-funds check to pay McOmber's bail. In his trial testimony and in the interview transcript and written summary, Peltier said that he wrote the check because McOmber promised to give him enough money to cover it.[6] Unlike Peltier's trial testimony, the transcript and the summary were admitted into evidence as exhibits and went into the jury room for deliberations along with the other exhibits. *See McOmber*, 2007 MT 340 ¶¶ 36–37.

The Montana Supreme Court held the error in admitting the exhibits was harmless. The court said the exhibits' admission was equivalent to "the jury's having what amounts to written copies of Peltier's trial testimony" in the jury room. *Id.* ¶ 37.[7] And, in his trial testimony, Peltier did not equivocate about blaming McOmber. He only equivocated when asked whether he had a motive to fabricate his testimony. *Id.* ¶ 36.

In sum, the inadmissible prior-consistent-statement exhibits were harmless to McOmber because they repeated Peltier's testimony that McOmber made him

---

[6] Two other witnesses, Campbell and Johnson, testified that McOmber asked them to pay his bail. Both testified they declined because they did not have any money. Their testimony corroborated Peltier's to the extent that Peltier said McOmber named Campbell and Johnson as the two people who would give him enough money to cover Peltier's check.

[7] Montana law generally does not permit the jury to have written copies of a witness's trial testimony in the jury room. By isolating and repeating the witness's testimony, it tends to give that testimony undue weight. *See State v. Hayes*, 2019 MT 231 ¶¶ 13–19; *State v. Nordholm*, 2019 MT 165 ¶¶ 9–14; *State v. Greene*, 2015 MT 1 ¶ 22 (citing *State v. Evans*, 862 P.2d 417, 419 (Mont. 1993); *State v. Harris*, 808 P.2d 453, 459–60 (Mont. 1991)).

do it. Peltier was only unsure about whether being arrested, jailed, and charged with a felony count of writing a bad check gave him a motive to lie.[8] Consistent with other applications of *Van Kirk*, and for that matter *Veis*, the *McOmber* court did not consider why Rule 801(d)(1)(B) limits prior consistent statements or why the prosecution wanted to introduce the prior consistent statements.

### (c) The Mixed Statements Rule

At Aker's trial, competent defense counsel would have been aware of another precept of Montana law on hearsay. Mixed consistent and inconsistent prior statements are admissible "where the nature of a witness's testimony makes it difficult for the court, and likely confusing to the jury, to separate or parse out the consistent from the inconsistent portions of the prior statement." *Tyer*, 2020 MT 273N ¶ 10.

This rule originates in *State v. Lawrence*, 948 P.2d 186, 198 (Mont. 1997); *see also State v. Jenkins*, 948 P.2d 204, 208 (Mont. 1997); *but see* Mont. R. Evid. 105, 106. In *Lawrence*, over the defendant's objection, the trial court admitted complete versions of a testifying declarant's prior statements, though they were "a mixture of consistent and inconsistent statements." *Lawrence*, 948 P.2d at 196. The trial court said, "[I]t probably is necessary to allow all of that in for the jury to

---

[8] Montana law generally does not require the declarant to agree that he fabricated his trial testimony, bowed to improper influence, or advanced an ulterior motive.

13

understand what was said." *Id.* The declarant, Mary, had been diagnosed with Alzheimer's-related dementia. In her prior statements, Mary would sometimes "answer the [investigating officers'] questions with declarative statements of fact," but at other times, when asked "the same or similar questions, Mary would answer with non-committal statements of 'I don't know' or 'I can't remember.'" *Id.*

At trial, Mary testified to some facts in direct examination that she no longer remembered when she was cross-examined. Citing, *inter alia*, the Commission Comments on Rule 801(d)(1)(A), the Montana Supreme Court held that, due to Mary's lapses of memory, most of her trial testimony was inconsistent with her prior statements and thus admissible. *See Lawrence*, 948 P.2d at 197–98. The court also explained that the nature of her trial testimony "made it especially difficult for the District Court to parse out specific inconsistent and consistent statements." *Id.* at 198. The court concluded that Mary's prior statements were admissible in their entirety, regardless of whether a specific assertion was consistent or inconsistent with her trial testimony. *See id.*; *see also, e.g.*, *State v. Mederos*, 2013 MT 318 ¶ 18; *State v. Howard*, 2011 MT 246 ¶ 31.

### (d) Summary

In deposition, one of Aker's trial lawyers said, "[I]t's . . . kind of the wild west" in Montana's trial courts. "[J]udges just allow in prior inconsistent[9]

---

[9]   Although Wright apparently said "inconsistent," the context shows he was talking

statements without understanding that it has to be related to the motivation to testify and all of that." Wright Dep. (Doc. 48-2) at 18:8–10, 30:19–31:1; *see also* State Br. (Doc. 43) at 33. Recently, the Montana Supreme Court seemed bemused by the idea that a declarant's testifying makes her out-of-court statements admissible. *See Tyer*, 2020 MT 273N ¶ 4 n.1, ¶ 9 n.5 ("We note there are no 'declarant testified earlier' or 'link it up later' exceptions to hearsay.").

But Montana case law *does* condone a hearsay exception for "the declarant testified earlier" or "we'll link it up later with what the declarant will say." Logically, a prior statement of a testifying declarant will always be either consistent or inconsistent with the declarant's trial testimony. An inconsistent statement is admissible under Rule 801(d)(1)(A). A consistent statement will necessarily support the same facts as the declarant's trial testimony. Its admission will always be harmless under *Veis* and will always pass at least the first step of the *Van Kirk* test. These tests do not account for the fact that repetition is not probative and yet is often persuasive to a jury. And a hearsay issue is moot if it is hard to say what is consistent and what is inconsistent with a declarant's trial testimony, because the entire prior statement becomes admissible under *Lawrence*.

When Montana's trial courts admit prior statements of testifying declarants without applying Rule 801(d)(1)(A) or (B), they are pragmatically following

---

about prior consistent statements.

Montana law. It does not explicitly favor admission of testifying declarants' out-of-court statements, but it is far from disavowing them.

### 2. Counsel's Performance at Aker's Trial

The State called five witnesses who testified to prior statements by C. Aker never claimed C. fabricated her testimony, bowed to improper influence, or harbored an ulterior motive. All prior statements consistent with her trial testimony were inadmissible "as a matter of law," *Oliver*, 2022 MT ¶ 27, under Rule 801(d)(1)(B).

The testimony of C.'s mother, Dr. Corbin, Sheriff Howard, and Kristi Rydeen was cumulative and harmless under either the *Veis* test or the *Van Kirk* test.[10] Their testimony will not be addressed in detail.

Cari Ray's testimony was different. Ray, a close friend of C.'s mother and of C., relayed for the jury the entire conversation she had with C. in January 2010, when C. first said she had been sexually assaulted. Prosecutor Daniel Guzynski

---

[10] *See* 2 Trial Tr. at 376:7–8, 376: 19–21 (C.'s mother testifies that Ray phoned and told her C. said she was sexually molested by Aker); *id.* at 400:9–401:13, 407:7–408:3 (Dr. Corbin testifies that C. said she was digitally penetrated and she noticed bleeding afterward); *id.* at 412:21–413:12, 430:10–14 (prosecutor twice referred to Aker as the perpetrator, but Rydeen neither affirmed nor denied C.'s identification of Aker); 3 Trial Tr. at 626:1–627:18 (cross-examining Sheriff Howard, the State recapitulated consistencies between C.'s statement to him and her trial testimony). Some of this testimony might have been objectionable and prejudicial on other grounds, such as relevance. In particular, the State's intent to "paint a picture" by showing the jury C.'s fear and pain during her forensic medical examination did not make it appreciably more likely that C. was sexually abused or that Aker did it. *See, e.g.*, 2 Trial Tr. at 381:6–382:7 (C.'s mother), 403:1–404:16 (Dr. Corbin); *see also* 3 Trial Tr. at 497:10–498:5 (Hansen); Mont. R. Evid. 403.

questioned her on direct examination:[11]

| Ray: | I said [to C.], "Okay, well I need to know exactly what you're trying to tell me." And that's when she proceeded to tell me about when she was . . . at the house on the west side, and Jim coming into the house. |
| Guzynski: | And did she give you a full account of what happened? |
| Ray: | Yes. |
| Guzynski: | What did she tell you? |

2 Trial Tr. at 338:11–17.

On the face of the transcript, it is difficult to imagine why counsel did not

immediately stand up and object to this question as calling for hearsay. Ray

testified at length and in largely narrative fashion[12] to what C. told her. *See id*. at

338:18–342:2; *see also id*. at 334:10–337:20. On occasion, Guzynski interrupted

---

[11] This Order substitutes dashes where the court reporter uses ellipses or semicolons. For instance, "At; one thing I want to ask you" in the transcript, *see* 2 Trial Tr. at 310:4–5, would appear here as "At—one thing I want to ask you." "Do you remem... She was stationed in Washington?" in the transcript, *see id*. at 311:7, would appear here as "Do you remem—She was stationed in Washington?" An ellipsis marks the Court's omission of words that appear in the transcript.

[12] *See, e.g.*, 3 Trial Tr. at 617:16–619:12, 626:1–627:10. Sheriff Howard, for example, was asked specific questions about what C. said: "Did she tell you . . . ?" rather than "What did she tell you?" He recorded C.'s statement and could refresh his memory by consulting a transcript or report. Defense counsel's cross-examination of Ray followed the same specific question-and-answer format in emphasizing inconsistencies between Ray's report of C.'s prior statements and C.'s trial testimony. *See* 2 Trial Tr. at 351:17–354:15. By contrast, the State's direct examination of Ray elicited her account of a whole conversation that took place 16 months before trial. The form of the State's questions was bound to call up mixed consistent and inconsistent statements. Aker has not objected to the form of the State's questions or asserted a distinction between prior written or recorded statements and a witness's recounting of a conversation.

17

her with further solicitations of hearsay: "Then she told you that Jim placed his hands inside of her?" *Id.* at 340:19–20. "Then what else did she tell you?" *Id.* at 340:22. "Anything else?" *Id.* at 341:12. "Did she talk to you about her experience going to the bathroom?" *Id.* at 341:21–22. Aker objected to nothing Ray claimed to relay from C.

Ray's prior statement to Sheriff Howard, *see id.* at 349:14–19, is not in the record of this case, so the Court does not know what Aker's counsel anticipated Ray would say. But, based on Montana case law, defense counsel could reasonably consider the following facts of legal life. To the extent Ray's account of C.'s prior statements proved inconsistent with C.'s trial testimony, Ray's testimony was admissible under Rule 801(d)(1)(A). Some of the statements Ray attributed to C. might be inconsistent and some consistent with C.'s trial testimony. That fact would almost certainly make it difficult to parse out the admissible from the inadmissible, not just because C.'s testimony was equivocal on some points, but also because Ray relayed C.'s prior statements from her recollection of an unrecorded conversation. That is, at any moment, Ray might or might not testify consistently with her *own* prior recorded statement. Because it probably would be difficult to categorize C.'s prior statements as consistent or inconsistent with her trial testimony as Ray was relaying them, an objection from defense counsel might persuade the trial court to inoculate all of Ray's testimony against hearsay

18

objection under *Lawrence*'s mixed statements rule.

Even if *every* prior statement Ray attributed to C. was consistent with C.'s trial testimony and erroneously admitted in violation of Rule 801(d)(1)(B), Ray's testimony was merely cumulative. That is why the State wanted to introduce it—it repeated and reinforced C.'s testimony. But Montana cases do not account for repetition as a means of persuading a jury. C.'s prior consistent statements were harmless by definition under *Veis*, and under *Van Kirk*, subject only to an after-the-fact assessment of whether, in light of all the evidence, Ray's secondhand testimony was more compelling than 12-year-old C.'s firsthand testimony to the same facts. *See McOmber*, 2007 MT 340 ¶ 35. Counsel's failure to object was consistent with a competent, realistic appraisal of Montana law on Rule 801(d)(1)(B).

If any testimony could be more compelling than that of a firsthand witness, Cari Ray's testimony at Aker's trial might be it. Ray described listening to a young girl, whom she knew well and cared for, tearfully describe sexual abuse by Jim Aker. Ray's adult, parental perspective was probably similar to many of the jurors' own perspectives. Ray testified more fluently, more dramatically, and in greater detail than C. did. If, as the Montana Supreme Court said in 1991, repetition does not imply veracity, *see Scheffelman*, 820 P.2d at 1297, then Ray's testimony did not make C.'s account more likely to be true, *see* Mont. R. Evid. 401. It likely

created for the jury a hopelessly entangled mashup of C.'s testimony, C.'s prior statements, and Ray's second-hand mental picture of the scene.[13] Ray's testimony was highly prejudicial to Aker.[14]

Even so, the possibility the Montana Supreme Court *might* have applied *Van Kirk*, instead of *Veis*, and *might* have found reversible error on appeal does not make counsel's failure to object at trial unreasonable. Counsel had no precedent showing that Ray's testimony to prior statements by C. that were consistent with

---

[13] As explained below in Part B, no one asked C. to explain how she recognized Aker. Ray and Sheriff Howard testified that C. said Aker said something to C. when he approached her on the couch. *See* 2 Trial Tr. at 338:18–339:3; 3 Trial Tr. at 619:1–12. C. testified that Aker did not say anything until just before he left, and she did not testify that Aker said what Ray and Howard said C. said Aker said. From Ray's and Howard's testimony, the jury could have inferred that C. saw Aker's face and heard his voice when he was very close to her. *But see* Mont. R. Evid. 602.

Ray further testified that C. said she and Aker spoke to each other when Aker entered the house. *See* 2 Trial Tr. at 338: 20–23, 352:9–10. Ray's testimony also suggested C. looked directly at Aker just before he left:

> Ah, when he was done, she said she just kind of laid there and kind of, she closed her eyes and acted a little bit like she was asleep, hoping that he would leave. And her eyes were *kind of open*, kind of closed, and when he got up he went over to the door and *turned around* and said "Now remember, you can't tell anybody about this because if you do, you and I will both get into trouble." So she laid there and he left.

2 Trial Tr. at 341:13–20. C. did not say her eyes were "kind of open, kind of closed." She said she closed her eyes sometime near the beginning of the incident. She testified to what Aker said when he left, but she did not say he "turned around" to say it.

[14] In its rebuttal closing argument, the State told the jury that Ray "described to you what it was like when she cradled C. and they cried together when she finally had C. tell her what happened to her. [¶] These are real, human moments that are unchallenged in this case. And they are extremely powerful." 4 Trial Tr. (Doc. 9-6) at 872:4–9. They are powerful but perhaps not probative. An honest mistake can give testimony "the ring of truth," making it "all the more likely to affect the judgment of the jury." *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005) (en banc). C.'s demeanor when she mistakenly identified another man as Aker was apparently similar to her demeanor at trial and, as Ray described it, during their conversation. *See, e.g.*, 2 Trial Tr. at 336:16–20, 336:23–337:2; 3 Trial Tr. at 621:3–11, 628:4–25.

C.'s trial testimony could cause unfair prejudice to Aker. Even since Aker's trial, the Montana Supreme Court has not provided such a precedent.[15] Almost thirty years have passed since a Montana case was remanded for a new trial after a testifying declarant's prior consistent statements were erroneously admitted. *See State v. Lunstad*, 857 P.2d 723 (Mont. 1993). In that case, the court did not consider harmless error.

### 3. Conclusion

Aker cannot show that trial counsel performed unreasonably by failing to object to inadmissible prior consistent statements elicited by the State. Counsel had reason to believe objection was fruitless. The State, for its part, anticipated that objection would be fruitless and so presented its case as if such statements were admissible, or at least not unfairly prejudicial. Because this assessment of Montana case law on Rule 801(d)(1)(B) was and remains reasonable, the State is entitled to summary judgment on Claim 2.

### B. Claim 1: Failure to Object to Closing Arguments

Aker alleges that counsel were ineffective because they should have

---

[15] *See, e.g.*, *Oliver*, 2022 MT 104 ¶¶ 28–29 (applying *McOmber*, i.e., *Van Kirk*); *Smith*, 2021 MT 148 ¶ 35 (applying *Van Kirk*); *Tyer*, 2020 MT 273N ¶¶ 9–10 (nature of interview made distinction between prior consistent and inconsistent statements impractical); *Mitchell*, 2019 MT 186N ¶¶ 12–13 (applying *Veis*); *Killsontop*, 2016 MT 235N ¶ 7 (applying *Van Kirk*); *see also Mederos*, 2013 MT 318 ¶ 24 (acknowledging that admissible evidence proving same facts generally makes inadmissible evidence harmless under *Van Kirk*, "regardless" of whether counsel objects).

objected to portions of the prosecutors' closing arguments. Again, *de novo* review applies. Aker must show, first, that counsel's performance was unreasonable, and second, that there is a reasonable probability he would have been acquitted had his counsel objected.

### 1. Unreasonable Performance

Generally, defense counsel's failure to object during closing argument is not unreasonable. *See Zapata v. Vasquez*, 788 F.3d 1106, 1115 (9th Cir. 2015). Counsel pick up on cues that are lost to the record. Merely remaining unconcerned, or at least looking like it, can be a reasonable response to objectionable argument. *See Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013); *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993).[16] For these reasons, a prosecutor's use of the word "lie" or remarks portraying witnesses as poorly dressed gum-chewing video-game-players, *see* 4 Trial Tr. at 876:23–877:4, do not provide compelling support for an ineffective assistance claim. Jurors use their common sense. They know rhetorical flair when they hear it.

Prosecutorial vouching is different. A prosecutor's "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry

---

[16] As the State rightly points out, *see* State Resp. Br. (Doc. 50) at 6–7, the element of unreasonable performance by defense counsel is not established just because a prosecutor's argument is improper. Still, whether closing argument was inappropriate is a necessary component of an allegation that counsel unreasonably failed to object. To that extent, cases discussing prosecutorial misconduct are relevant and instructive.

much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88 (1935),[17] *quoted in State v. Krause*, 2021 MT 24 ¶ 26; *see also, e.g.*, *State v. Criswell*, 2013 MT 177 ¶¶ 54–57 (McGrath, Ch. J., concurring); *State v. Hart*, 625 P.2d 21, 25 (Mont. 1981); *State v. Toner*, 263 P.2d 971, 974 (Mont. 1953) (citing or quoting from *Berger*). "Improper vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005) (internal quotation marks and citations omitted); *see also United States v. Young*, 470 U.S. 1, 17–19 (1985); *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980).

In the State's rebuttal closing at Aker's trial, prosecutor Joel Thompson did both. Near the beginning of his argument, Thompson asserted:

> It's one thing to take each little bit of this and try to come up with little explanations; 'oh, [C.'s] brother was mean to her.' '[O]h, people at school were mean to her.' That's the explanation. Well Kristi Rydeen certainly didn't think so. She wasn't treating her for being bullied by her brother or being pushed out of the car, or whatever that was. She was treating her for being sexually abused, for being traumatized by sexual abuse. . . . So let's talk about what and why we believe this.

---

[17] *Berger* was a federal prosecution, but "there is no meaningful distinction between the Fifth Amendment's due process clause and that of the Fourteenth for this purpose." *Jordan v. Hepp*, 831 F.3d 837, 846–47 (7th Cir. 2016).

4 Trial Tr. at 872:10–21.

Rydeen, C.'s therapist, did *not* testify that she "was treating [C.] for being sexually abused" or "for being traumatized by sexual abuse."[18] Thompson told the jury what Rydeen did not, misstating both her testimony and her competence as a witness. He ended that misrepresentation by turning to talk about why "we believe this." Defense counsel did not object.

The phrase "we believe this" could have been isolated and inconsequential. It wasn't:

> First of all, the law and the Judge told you 'the evidence presented by one witness whom you believe is sufficient for the proof of any fact in this case.' So when you sat there and you watched that little girl demonstrate that authentic emotion, I know you all had reactions. And I have to have faith and submit to you that that reaction was disclosed on the truth. I believe what I'm hearing here.
>     That's the only thing a lot of times Mr. Guzynski and I can rely on. And that again is why we bring these kids in here and we prepare them and we try to get them to some degree to muster the strength and ask them to do something we would never ask a kid to do normally. And maybe cause them pain by doing it. It's part of our job.

4 Trial Tr. at 873:4–16.[19]

---

[18] Rydeen properly testified that C.'s demeanor in discussing "the incident of abuse perpetrated by Jimmie Aker" (as Thompson put it in his question) was consistent with what C. said about the incident. *See* 2 Trial Tr. at 412:21–413:14. She testified that with "much more sessions and collaborative efforts with forensics and things like that I would probably look into giving her . . . a stronger diagnosis that she had been abused," but "I diagnosed her with post traumatic stress disorder," *id.* at 416:5–11. She testified that it was "not my position . . . . to determine" whether C. was, in fact, sexually abused. *See id.* at 414:21–415:2.

[19] *See also* 4 Trial Tr. at 831:10–832:3 (Guzynski says in State's initial closing, "[W]e make them go through interviews, we make them go through sexual assault exams, they have to be interviewed by defense counsel, over and over every word, every word recorded. They don't

This is vouching. *See, e.g.*, *United States v. Wright*, 625 F.3d 583, 610–12 (9th Cir. 2010).[20] "A prosecutor has no business telling the jury his individual impressions of the evidence." *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992); *see also, e.g.*, *Aker I*, 2013 MT 253 ¶¶ 26–27. "[T]he jury may be misled into thinking [a prosecutor's] conclusions have been validated by the government's investigatory apparatus," *Kerr*, 981 F.2d at 1053—or in other words, that the prosecutors "know things" the jury does not. Thompson invited the jury to give the prosecutors the benefit of the many cases they try and the many abused children they work with: "I have to have faith . . . . I believe what I'm hearing here. . . . It's part of our job." Defense counsel did not object.

Thompson stressed Guzynski's personal efforts to impeach one of Aker's three alibi witnesses,[21] Amie Manahan. Guzynski fairly and squarely proved Manahan lied about how she injured her shoulder—an issue unrelated to the allegations against Aker. Manahan testified that she injured her shoulder at work at Warm Springs and did not file a report because she had already claimed two work-

---

make a mistake, do they; not when all that has to be tested.").

[20] Part of *Wright* was superseded by a statutory amendment. The portion cited here remains valid and offers several examples of inappropriate closing argument.

[21] The alibi witnesses testified that they were with C. on the night she claimed she was assaulted, and Aker did not visit the house. Aker testified that he did not visit the house. In addition to Manahan's credibility issue, the other two witnesses at least made a mistake about when Aker fell in their yard or whether he had stitches at the time. But if Aker did not visit, he did not know whether the alibi witnesses were home or not. Thus, their credibility was not directly linked with Aker's.

related injuries and did not want to claim another. She admitted she had told her

employers and her doctors that she slipped and fell on the ice, and she testified that

that was a lie. So far, so good. But Thompson said:

> So why do we challenge Amie Manahan and why do we show that she
> lies? It wasn't to show that she was mistaken about that night. It was
> to show that Amie will lie when it suits her purpose, Ladies and
> Gentlemen. Mr. Guzynski proved that beyond any doubt. . . .
>      . . . Amie, we've shown you, will assert to Mr. Guzynski in her
> interview "That's how I remember that, that's the only reason how I
> remember." And like people who are deceptive, they will say 'go look
> it up, go check it out.' Well, she didn't count on the fact that he did
> and would. My co-counsel is very thorough. And he found out there
> was no record of this incident at Warm Springs and this record of
> falling on the ice. To do what? To get treatment in the form of
> narcotics.

4 Trial Tr. at 876:1–5, 876:10–18.

"Improper vouching occurs when the prosecutor places the prestige of the

government behind the witness by providing personal assurances of the witness's

veracity," or, in this case, lack of veracity. *Kerr*, 981 F.2d at 1053 (internal

quotation marks, citation, and brackets omitted) (quoting *Roberts*, 618 F.2d at

533). Manahan disputed Guzynski's claim that she told him to "go look it up." *See*

3 Trial Tr. at 665:3–668:1. Guzynski introduced no evidence suggesting that *both*

of Manahan's stories were false. He called no witness[22] to contradict Manahan's

testimony about what he said to her or what she said to him. No testimony or

---

[22] Sheriff Howard was present for the interviews and testified at trial. He was not asked
about his interview of Amie Manahan.

evidence indicated that Manahan made up an injury "[t]o get treatment in the form of narcotics." Thompson told the jury that, thanks to Guzynski, everyone knew what really happened—Manahan didn't hurt herself at all and just lied to get painkillers. Defense counsel did not object to Thompson's misstatements of the evidence.

Immediately after misrepresenting this already confusing episode in the trial, Thompson urged the jury to attribute Manahan's lie to all three alibi witnesses:

> So it's very important that you assess Ms. Manahan's credibility and the credibility of those three people. And keep in mind that idea, cuz we're all in from different parts of society, from different social stratus. Think about these people. I don't want to disparage them any more, but these are people who couldn't be asked to take the gum out of their mouth when they were testifying, to change into jeans in the courtroom, to wear something other than sweats and sandals. In that group of people where you're unemployed and collecting unemployment or workers' comp, and you play video games all day, that, there is a nobility for them in the idea that you protect your innocent friend. You rally around him.
>
> The problem with that, Ladies and Gentlemen, is that by doing so they are attempting to rob that little girl of the justice that she requires, the justice that we all require. And that's why we can't let it go, and that's why we have to tell you that they're not being truthful.

4 Trial Tr. at 876:19–877:10.

Trial lawyers are free to argue about the meaning of the evidence and reasonable inferences that can be drawn from it. It is not reasonable to infer that people who wear sweats and chew gum and play video games are either lying or blindly loyal to their friends. But the unreasonable inference was not Thompson's

only point. He was telling the jury that he and Guzynski *knew* Aker's witnesses

would lie, so Guzynski made a special effort to catch one of them in a statement he

could prove was not true: "*We* can't let it go . . . . *We* have to tell you that they're

not being truthful." *See also* 4 Trial Tr. at 848:13–24, 875:10–16. Defense counsel

did not object.

> Thompson continued:
>
> So it's not just about them protecting their friend too. Let's also consider their own self-interest. Consider this, how much would they want to admit, and again I have to draw you back to the social strata. How much would they want to admit that on that Friday night when they were staying up until 2:00 in the morning. We didn't ask them what they were doing, we didn't ask them if they were drinking or doing drugs, I think we knew that they would say 'no'. But how much would they want to admit that they left on that Friday night, their two, 2 year old kids alone, even asleep, and little 8 year old L., and left her in the care of a 12 year old girl [C.]? That's their own self-interest.
> 　　Do you think they're cognizant of maybe Child Protective Services hearing about that? So it's not just them protecting their friend. They've got their own reasons to protect themselves.

4 Trial Tr. at 878:3–18.

These remarks are the first and only mention at Aker's entire trial of Child

Protective Services, or drinking, or "doing drugs"—a phrase suggesting more than

Amie Manahan popping a Lortab. C. testified the adults left the house. Based on

nothing, Thompson told the jury they left to drink and get high. Who would know

what these folks got up to on Friday nights if not prosecutors and Child Protective

Services? "[T]the use of 'we know' readily blurs the line between improper

vouching and legitimate summary." *Younger*, 398 F.3d at 1191; *see also*

*Sassounian v. Roe*, 230 F.3d 1097, 1106–07 (9th Cir. 2000) (noting counsel's

objection and trial court's instruction in response to prosecutor's reference in

cross-examining defense witness to "when we found out about your lies"). But no

one can legitimately summarize witnesses' responses to questions they are not

asked. Defense counsel did not object to Thompson's mention of Child Protective

Services or the claim that the prosecutors knew what witnesses would say without

asking them.[23]

Thompson continued:

> One thing you have to keep in mind, Ladies and Gentlemen, C. at any
> time during this process could have turned to us and said, 'It didn't
> happen. I can't stand to see my mother suffer like this. I have to tell
> you that this didn't happen.' But when we're telling her 'you need to
> come into court and you gotta talk to these people,' that terrifying

---

[23] These remarks resonated with Guzynski's initial closing argument. He argued, fairly, that the three alibi witnesses could have colluded, because they all saw a document laying out the State's allegations, and the Zinkes shared a mistaken belief that Aker had stitches in his back on a day when he fell down in their yard. *See* 4 Trial Tr. at 847:14–850:11. Guzynski then retailed his investigation of Amie Manahan. *See id.* at 850:12–853:16. He rounded off these six pages by saying:

> And then she [Manahan] just goes to a normal doctor and says 'I hurt my
> shoulder.'
>
> This is what you have to do. Evidence is tested. Is she worthy of belief
> when she says these incredible things?
>
> We do know that right after this, in the month of December, Christmas
> time, she gets pain killers, she's watching movies with Donny [Zinke] and Mr.
> Aker, all hanging out. I mean this [unintelligible] you, but I think you folks are
> going to have to determine—I'd ask you to look at the way they testified, maybe
> consider the idea that these three people just came in to lie, that Mr. Aker lied.

*Id.* at 853:16–854:2. In this proceeding, the State contends that the prosecutors "never suggested that Aker met with his three witnesses and agreed to lie." State Reply (Doc. 57) at 9. A reasonable juror could have heard Guzynski suggest exactly that.

thought, and she could have at any time said, 'Guys, guys, this didn't happen. I'm sorry, I made this up.'

4 Trial Tr. at 884:6–13. Again, Thompson referred to his and Guzynski's role in vetting the evidence.[24] He told the jury they stayed alert to any reason C. might give them to doubt her account, and she gave none. They did not, of course, testify or subject themselves to cross-examination on that fact. Thompson also implied that C. was able, willing, and welcome to confide in them. She did not testify to that fact. Aker's counsel did not object that Thompson was referring to facts not in evidence or vouching.

Aker's counsel objected in the State's initial closing argument, in an unsuccessful attempt to stop the prosecution from arguing that Aker failed to prove C. was lying. *See* 4 Trial Tr. at 838:11–18. Hooks also objected once in rebuttal closing, when Thompson asserted that a child defense witness "checked every answer with her mom" as she testified. That objection was sustained. *See id.* at 879:1–6.

But counsel did not object when Thompson said "let's talk about what and

---

[24] In both opening statement and closing arguments, the prosecutors pointed out the recorded interviews and evaluations C. underwent, whether because Aker's lawyers put her through them or they put her through them themselves. *See* 2 Trial Tr. at 252:8–13 (C. would be cross-examined by Aker's "grown man attorneys"), 255:21–257:3 ("[W]e still have to look" for trace medical evidence even when "we" expect to find none, "[u]nfortunately for C."); 4 Trial Tr. at 831:12–832:3, 843:9–21, 884:6–16. Some of these assertions, in different form, could have contributed to fair argument. They became part and parcel of Thompson's vouching for the State's case.

why we believe this," or "I believe what I'm hearing here," or "It's part of our job," or C. "could have turned to us," or "we challenge" Aker's witnesses, or "we can't let it go" so Guzynski will leave no stone unturned, or "we" can "tell you that they're not being truthful," or "we knew" the alibi witnesses "would say no," meaning "we" knew they would lie, if "we ask[ed] them if they were drinking or doing drugs." Thompson made these comments in rebuttal closing—"we," "we," "we," all the way home.

Since Thompson flat-out said, "[W]e believe this" and "I believe what I'm hearing here," the trial court almost certainly would have sustained an objection. If not, at least an objection would have called Thompson's conduct into question. He might not have gone on to talk about what "we" can't let go or what "we" do not need to ask defense witnesses because "we" already know what they will say.

Thompson' repeated recourse to what "Mr. Guzynski and I" proved and believe was inappropriate and pervasive. Counsel's silent acceptance of it was unreasonable.

### 2. Prejudice

To prevail on this claim, Aker must show a reasonable probability that he would have been acquitted if counsel had objected.[25] The improper comments must

---

[25] In *Aker I*, the Montana Supreme Court held that the prosecution's closing arguments about the alibi witnesses did not support plain error review. *See Aker I*, 2013 MT 253 ¶¶ 23–31. The court had no occasion to consider whether Aker would have prevailed on a timely objection

be viewed "in the context of the entire trial." *Trillo v. Biter*, 769 F.3d 995, 1001

(9th Cir. 2014).

> To do that, we look to the weight of the evidence submitted against
> [the petitioner], the prominence of the erroneous comments in the
> entire trial, whether the prosecution misstated the evidence, whether
> the judge instructed the jury to disregard the comments, whether the
> comment was invited by defense counsel in summation, and whether
> defense counsel had an adequate opportunity to rebut the comments.

*Id.*; *see also Zapata*, 788 F.3d at 1117–23 (applying these factors to assess

prejudice under *Strickland*).

The judge did not instruct the jury to disregard the comments. Counsel had

no opportunity to rebut them, because they were made in the State's rebuttal

closing. Defense counsel did not invite the comments. He might have used "we" as

frequently as the prosecution did. For instance, he said:

> So the question becomes, has the State proven beyond a reasonable
> doubt that the abuse that's alleged actually happened?
>     We told you that Jimmie was never in that house and that it
> didn't happen. What evidence shows that Jimmie is in the house?
> Well, the people who were in the house that night came in and told
> you that it could not have happened because Jimmie wasn't there.

4 Trial Tr. at 856:9–16. But unlike the prosecutors, Aker's counsel did not reassure

---

at trial or, if counsel had objected, whether there was a reasonable probability the jury might
have settled on a different interpretation of the evidence presented to it. The State agrees that §
2254(d) does not apply and that review is *de novo*. *See* State Br. in Supp. (Doc. 43) at 10.

At any rate, appellate counsel evidently did not direct the Montana Supreme Court's
attention to Thompson's statements of personal belief. Both the majority opinion, *see Aker I*,
2013 MT 253 ¶¶ 16–19, 31, and the dissent, *see id.* ¶¶ 41–43, discussed only the prosecutors'
disparaging remarks about the alibi witnesses.

the jury he had vetted the evidence. He did not refer to counsels' role in investigating the case or suggest he knew things he did not present to the jury. Aker's counsel did not say he "believe[d]" anyone. The last three *Trillo-Zapata* factors tip toward Aker.

The first three factors do, too. The evidence against Aker was thin. As a result, Thompson's comments stood out prominently against the backdrop of the testimony. And, as noted above and below, he and Guzynski misstated the evidence in important respects.

Ordinarily, prosecutors do not need to talk about what "we" know or what "we" did to investigate and prepare the case. They talk about the evidence. They can say to the jury, "*You* know this element is met, because *you* heard Jones testify that he saw a pound of methamphetamine on the kitchen table."

Because the evidence was thin, that approach was not realistic in this case. C. testified that the adults left the house shortly after dinner without telling her. She took on the role of babysitter. About twenty minutes later, leaving her cousin and two younger children upstairs, C. went downstairs to watch *Hannah Montana* on television:

| Guzynski: | At some point C. does somebody come over to the house? |
|---|---|
| C.: | Yes. |
| Guzynski: | Who comes over? |

C.:              Jim Aker.

The next question ought to be, "And how did you know it was Jim Aker?"
"Could you see him clearly?" "Did you recognize his voice?" The prosecutor never
asked these questions[26]:

Guzynski:       And what door does he come in at?

C.:             The front door.

Guzynski:       Did he say anything to you when he came in?

C.:             No.

. . .

Guzynski:       Did he walk over to you?

C.:             Yes.

Guzynski:       And after he walked over to you did he say anything to
                you?

C.:             No.

. . .

Guzynski:       The, when he walked over to you, you indicated he did
                something with his hand toward your chest?

C.:             Ya, he held my chest down so I couldn't get up or

---

[26] *See* 2 Trial Tr. at 290:13–298:8 (direct examination); *id.* at 317:16–319:16, 320:16–
321:21 (cross-examination); *id.* at 322:10–25, 323:11–23 (redirect). The State claims that Aker's
identity was "not in dispute," that he "defended against the charge by arguing that it never
happened, not that it happened but he was not the perpetrator." State Br. (Doc. 43) at 39; *see also*
State Reply (Doc. 57) at 19. Aker presented alibi witnesses and evidence of a serious back
injury. His responsibility for the assault was clearly in question.

anything. And I just acted like I was sleeping cuz I was too scared (one word).[27]

Guzynski:    And why did you act like you were sleeping?

C.:          Because I was scared and I didn't want to say anything and I was afraid that nobody would believe me and that I was afraid that I would be in trouble if I did tell.

Guzynski:    And so when he put his hand on your chest, C., were you trying to fight him or anything or were you—

C.:          No.

Guzynski:    —just trying to act like you were sleeping?

C.:          I just acted like I was sleeping.

. . .

Guzynski:    One last thing, C., this is just one last question, I just need you to point out, this needs to be done, you need to point to the person you've been referring to as Mr. Aker who hurt you.

C.:          (crying)

Guzynski:    Is he sitting next to a person in a suit wearing a tan shirt?

C.:          Yes.

Guzynski:    Short-sleeved?

C.:          Yes.

2 Trial Tr. at 291:10–18, 292:1–5, 293:6–19.

---

[27] The court reporter apparently inserted the parenthetical phrase.

The State introduced evidence showing that C. knew Aker before the incident. He used to date her aunt. At that time, she called him "Uncle Jimbo" and liked him. *See* 2 Trial Tr. at 282:13–283:14, 369:24–370:18. C.'s mother testified that she met Aker in August of 2007. *See id.* at 388:12–17. It was not clear when C. met him, how long she knew him, or when she last saw him.[28] C. testified that the incident happened sometime after 6 p.m., that is, in nighttime darkness. *See* 2 Trial Tr. at 289:1–16; Fed. R. Evid. 201(b). No one asked whether the room had windows,[29] whether lights were on, or whether only the television cast light. No other witness's testimony indicated that C. told them how she knew the man was Aker. No one asked whether anyone other than Aker ever visited[30] the house or, if so, whether they had a size or build similar to Aker's.

Prejudice might be adequately established at this point, but there is more. Everyone agreed that, a few months after the incident, C. thought she saw Aker "waving at her" at Territorial Days, a community event. She was "very, very upset" at seeing him and reported it to a police officer. Everyone agreed that C. "made a mistake," because "it would have been impossible" for Aker to attend the

---

[28] Aker said he had not seen C. "in two years," 4 Trial Tr. at 812:7–13, or for about seven months before the incident.

[29] One prosecutor referred to it as a "basement," *see* 4 Trial Tr. at 842:7, but C. said the man entered at "the front door," *see* 2 Trial Tr. at 291:15–16.

[30] To commit the crime, either Aker had to drop by, or someone had to invite him over. If someone invited him over, it was odd they all left before he arrived. No one testified that Aker habitually dropped by. His witnesses testified to calling him and inviting him over on multiple occasions.

event. *See* 3 Trial Tr. at 621:1–11, 628:4–25 (Sheriff Howard).[31] At trial, no one asked C. about this incident. The State introduced no evidence to explain it. It did not show how far away C. and the man were from each other, whether there was a crowd, or why C. thought the man was Aker.[32]

> Aker pursued a defense of mistake. In opening statement, counsel said:
>
> So why would a 12 year old girl say something that didn't happen? Sometimes not every question gets answered in a trial like this. We talked today about presumption of innocence. It is not our burden to try to convince you of a reason why. For whatever reason, C. was mistaken.

2 Trial Tr. at 266:22–267:2. At no point did Aker or his attorneys claim that C. lied.[33]

> Even so, most of each prosecutor's closing argument was devoted to

---

[31] The jury was not told that Aker was in jail. *See* 1 Trial Tr. (Doc. 9-3) at 12:12–19:23.

[32] In closing argument, Guzynski urged the jury to disregard C.'s mistake, referring to a "crowded environment" at Territorial Days and asserting that C. had "been isolated" until she attended it. *See* 4 Trial Tr. at 854:19–855:3. Other than the sheriff's testimony that the event was generally well-attended, *see* 3 Trial Tr. at 627:19–628:3, no evidence supported these descriptions.

[33] Near the beginning of his rebuttal closing, Thompson asserted:
> There's suggestion here that someone would have had to put [C.] up to this. That woman over there, in tears, she'd have to be a monster to put her daughter through this if it didn't happen to her.

4 Trial Tr. at 871:23–872:2. Thompson could fairly argue that there was no reason to believe someone "put C. up to this," because a reasonable juror might wonder about that. To the extent Thompson implied that C.'s mother knew what happened to her, he misstated the evidence. C.'s mother had no firsthand knowledge. She testified, "To this day [C.] hasn't told me what happened." 2 Trial Tr. at 378:7–8.

Aker did not suggest C.'s mother "put her up to this." In cross-examination, the State asked Aker whether he "gave C. any reason" to "make this up about you." Aker said, "Not her specifically," and he could not "say what her mindset is." 4 Trial Tr. at 812:7–23. Who Aker or the State might have had in mind was not shown.

showing how ridiculous it was to suppose that C. lied and made the whole thing up. *See, e.g.*, 4 Trial Tr. at 836:21–841:20, 844:1–845:2, 871:23–872:2, 879:20–880:3, 880:20–887:25. In order to convict Aker, the jury had to find that *he* lied, because he testified he was not there. But a defense of mistake meant that the jury could acquit Aker without labeling C. a liar.[34] Whether strategic or coincidental, the prosecutors' insistence that C. could not be lying was consistent with their emphasis on their roles in investigating and vetting the evidence. That approach distorted the evidence and the jury's job and deprived Aker of a fair trial.

Aker was prejudiced by Thompson's rebuttal closing argument.[35] *Compare Trillo*, 769 F.3d at 1001–02; *cf. also Evans v. Jones*, 996 F.3d 766, 780 (7th Cir. 2021) (finding weight of the evidence of shooter's identity was so slight as to justify relief even under stringent standards of 28 U.S.C. § 2254(d), which do not apply here). With no evidence of what C. observed, and undisputed evidence that

---

[34] As Aker's counsel did not claim that C. was lying, the implicit assumption that either C. or Aker must be lying was not shared between the parties. "But even if the attorneys shared the implicit assumption . . . this shared belief is not evidence and does not introduce ambiguity into" the evidence. *Evans v. Jones*, 996 F.3d 766, 777 (7th Cir. 2021).

[35] Aker also introduced evidence from doctors and friends that he injured his back on October 30, 2009. He had surgery to remove an extruded disc fragment on December 11, a week or two after C. was assaulted. He acknowledged that he was physically able to drive to the house, walk in, and sit, bend, or kneel as C. described. *See, e.g.*, 2 Trial Tr. at 266:15–17 (opening statement). A reasonable juror could have thought Aker exaggerated the injury. *Compare, e.g.*, 4 Trial Tr. at 784:11–785:18, 787:12–23, 803:21–804:5, 813:6–20, *with* 3 Trial Tr. at 630:8–11; 4 Trial Tr. at 795:11–23, 806:7–809:14. But the jury could not reasonably doubt that the injury was serious. It had to consider the possibility that Aker's movements would be slow and painful and that his injury might make him less likely to "drop by" the house just to see if anyone was home. *See, e.g.*, 3 Trial Tr. at 558:14–562:8, 564:6–18, 569:6–13 (Russo); 4 Trial Tr. at 761:12–764:21, 766:15–17 (McLaws); 3 Trial Tr. at 727:7–728:23 (Reinbolt).

she later mistook someone else for Aker, Thompson's assurances that he and Guzynski thoroughly vetted the case likely persuaded the jury to relinquish reasonable doubt and return a guilty verdict. But for defense counsels' failure to interrupt these hollow reassurances, there is a reasonable probability Aker would have been acquitted.

Aker is entitled to summary judgment on Claim 1.

### C.  Claim 5:  Cumulative Prejudice

Aker's Claim 2 does not show that trial counsel performed unreasonably. Any prejudice Aker incurred cannot be added to prejudice created by Thompson's closing argument. *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 150–51 (2006). The State is entitled to summary judgment on Claim 5.

### III. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues

presented are adequate to deserve encouragement to proceed further." *Gonzalez v. Thaler*, 565 U.S. 134, 140 (2012) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

"[A] claim can be debatable even though every jurist of reason might agree, after a COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003). The outcome of Claim 2, and therefore Claim 5, is reasonably debatable. A COA will be granted on those claims. As Aker prevails on Claim 1 and has not contested Claims 3 and 4, a COA is not warranted on those claims.

## IV. Motion to Withdraw

On August 12, 2022, Aker's counsel filed a motion to withdraw. The motion will be denied at this time, subject to renewal at Aker's option.

Accordingly, IT IS ORDERED:

1. The State's motion for summary judgment (Doc. 42) is GRANTED as to Claims 2, 3, 4, and 5. Aker's motion for summary judgment (Doc. 45) is GRANTED as to Claim 1.

2. A certificate of appealability is DENIED as to Claims 1, 3, and 4 and GRANTED as to Claims 2 and 5.

3. The clerk is directed to enter judgment, by separate document, in favor of Petitioner and against Respondents on Claim 1 and in favor of Respondents and

against Petitioner on Claims 2, 3, 4, and 5.

4. Within forty-five (45) days of the date of this Order, the State may move to vacate the state criminal judgment and renew proceedings against Aker in the trial court. If the proceedings are renewed in state court, the State must promptly file notice in this action.

5. If the State does not file notice on or before **October 7, 2022, a**t **12:00 noon**, Respondents shall immediately and unconditionally release Aker from all custody based on the Judgment (Doc. 9-8) in *State v. Aker*, No. DC-10-32 (Mont. Third Jud. Dist. Court Oct. 17, 2011), and Aker may not be retried.

6. Counsel's motion to withdraw (Doc. 62) is DENIED.

DATED this 22nd day of August, 2022.


John Johnston
United States Magistrate Judge